## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NICHOLAS J. KOROLY, Individually and on Behalf of All Others Similarly Situated, and on Behalf of the FEDERATED HERMES INC., EMPLOYEES PROFIT SHARING/401(K) PLAN,<br><br>                              Plaintiff,<br><br>        vs.<br><br>FEDERATED HERMES INC., the ADMINISTRATIVE COMMITTEE and the INVESTMENT COMMITTEE of the FEDERATED HERMES INC., EMPLOYEES PROFIT SHARING/401(K) PLAN, and JANE and JOHN DOES 1-20,<br><br>                              Defendants. | Civil Action No.__23-1563_____<br><br><br><br><br><br><u>**COMPLAINT—CLASS ACTION**</u> |

Plaintiff Nicholas J. Koroly brings this action as an individual participant and beneficiary of the Federated Hermes, Inc. ("FHI") Employees Profit Sharing/401(k) Plan (the "Plan"), both for himself, on behalf of all others similarly situated, and on behalf of the Plan itself – and alleges as follows, based upon personal knowledge or upon information and belief:

### INTRODUCTION

1.      This action stems from Defendants' history of self-dealing at the expense of its own workers' retirement savings and other ongoing fiduciary breaches, which has violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq*.

2.      The duties and obligations imposed on plan fiduciaries pursuant to Section 404 of ERISA, 29 U.S.C. §1104, are amongst "the highest known to the law," *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-cv-01493-CCW, 2022 WL 973581, at *5 (W.D. Pa. Mar. 31, 2022). Those

include, *inter alia,* the duty of loyalty, which requires plan fiduciaries to act solely in the interest and for the benefit of plan participants when selecting plan investments, and the duty of prudence, which "requires that fiduciaries not only prudently select and monitor investments, but also 'understand and monitor plan expenses,' . . . like administrative fees [which] can 'significantly reduce the value of an account in a defined-contribution plan.'" *Id*. (citing *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328, 333 (3d Cir. 2019) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)).

3.      As fiduciaries to a retirement plan with over $600 million in assets, Defendants have considerable bargaining power in the marketplace for retirement services, which could and should be exercised in accordance with Defendants' fiduciary obligation to procure a diversified slate of suitable investment options at reasonably competitive rates and defray administrative expenses associated with administering the Plan.  Moreover, because FHI is itself a retirement investment manager that sells mutual funds and other proprietary investment products in its ordinary course of business, it is reasonable to infer that Defendants are in an even better negotiating position than other similarly situated fiduciaries in terms of their expertise and knowledge of the market for retirement plan services.  In short, Defendants are uniquely well-positioned to identify, procure, and offer the best investment options on the market through the Plan.

4.      Since at least August 28, 2017, and through to the present day (the "Relevant Period") however, Defendants have continuously failed to do so.  Rather than prudently evaluating and selecting investment options for the benefit and in the best interest of the Plan's participants, Defendants have opted for a questionable lineup of underperforming and overpriced FHI proprietary funds (the "FHI Proprietary Funds") as the only investment offerings in the Plan's lineup throughout the Relevant Period.

5.      Even as the FHI Proprietary Funds proved to be problematic investments –
exhibiting poor performance against market benchmarks as compared to similar funds in the
market – Defendants continuously failed to correct course by removing those funds from the Plan
or diversifying the self-serving proprietary investment lineup offered through the Plan.

6.      As a result of Defendants' repeated, continuous, and ongoing violations of
29 U.S.C. §1104 (fiduciary breaches) and 29 U.S.C. §1106 (prohibited transactions), Plaintiff has
incurred and continues to incur substantial losses that could and should have been avoided, and for
which Defendants are liable as ERISA fiduciaries under 29 U.S.C. §1109 and/or co-fiduciaries
under 29 U.S.C. §1105.

7.      Accordingly, Plaintiff brings this civil enforcement action pursuant to
29 U.S.C. §1132(a), to recover losses incurred by the Plan or its participants and beneficiaries as
a result of Defendants' fiduciary breaches, restore any and all profits or other benefits wrongfully
had and/or retained from Plan assets, and to seek all other appropriate equitable relief and available
remedies to account for and redress each fiduciary breach.

## JURISDICTION AND VENUE

8.      This Court has exclusive jurisdiction over the subject matter of this action pursuant
to 29 U.S.C. §1132(e)(1), and venue is proper pursuant to 29 U.S.C. §1132(e)(2) because
Defendants maintain corporate headquarters and/or administer the Plan in the Western District of
Pennsylvania.

## PARTIES

9.      Plaintiff Nicholas J. Koroly is an ERISA plan "participant" within the meaning of
29 U.S.C. §1002(7) who invested in FHI Proprietary Funds through the Plan during the Relevant
Period.

10.    Defendant Federated Hermes, Inc. ("FHI"), is a publicly traded investment management company (NYSE: FHI) and Delaware Corporation headquartered in Pittsburgh, Pennsylvania.  As is relevant here, FHI is both the "plan sponsor" and designated "administrator" of the FHI Employees Profit Sharing/401(k) Plan (the "Plan"), as those terms are defined at 29 U.S.C. §1002(16).  Accordingly, FHI is an ERISA fiduciary subject to the statutory duties and obligations set forth herein.

11.    All other Defendants identified herein are ERISA fiduciaries within the meaning of 29 U.S.C. §1002(21)(A) by reason of having been employees, officers, and/or agents of FHI that exercised discretionary authority or control over the administration and management of the Plan and/or Plan assets during the Relevant Period.  Accordingly, such Defendants are likewise subject to the statutory duties and obligations imposed upon ERISA plan fiduciaries.

## ERISA FIDUCIARY STANDARDS AND LIABILITY

### A.    Fiduciary Duties (29 U.S.C. §1104)

12.    ERISA plan fiduciaries are subject to strict duties of loyalty and prudence, which must be discharged "***solely in the interest of . . . [plan] participants***" [emphasis added], and –

> (A)  for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;
>
> (B)  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C)  by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the [aforementioned fiduciary duties and all other applicable provisions of ERISA].

29 U.S.C. §1104(a)(1)(A-D).

13.     Federal regulations and existing case law provide substantial additional guidance on the precise contours of ERISA plan fiduciaries' obligations under the foregoing provisions.

14.     With respect to the duty of loyalty, for example, the U.S. Department of Labor has construed the requirement that a fiduciary "act solely in the interest" and "for the exclusive purpose of providing benefits" to plan participants as a commonsense rule against "subordinating the interests of participants and beneficiaries in their retirement income to [any other] unrelated objectives."   29 C.F.R. §2509.2015-01, 2020 WL 6637832, 72846, 72847; *see also* Advisory Opinion, Docket No. 1998-04A (Dep't of Labor May 28, 1998) ("[I]n deciding whether and to what extent to invest in a particular investment, or to make a particular fund available as a designated investment alternative, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.").

15.     The U.S. Department of Labor has issued regulations interpreting the prudence requirements imposed on ERISA fiduciaries in connection with plan investment decisions.  As is relevant here, those regulations provide that a fiduciary's procedural due diligence obligations with respect to plan investment decisions "are satisfied if the fiduciary" has given "appropriate consideration" to the "facts and circumstances" that "are relevant to the particular investment or . . . course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio[,]" and "has acted accordingly." 29 C.F.R. §2550.404a-1(b)(1)(i)-(ii).

16.     The term "appropriate consideration" as used in these regulations " shall include, but is not necessarily limited to" a prudent fiduciary's consideration of whether "the particular investment or . . . course of action is reasonably designed, as part of the portfolio . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or . . . course of action compared [with other] reasonably available alternatives with similar risks[.]"  29 C.F.R. §2550.404a-1(b)(2)(i).

17.     Specifically, "a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan."  Advisory Opinion, Docket No. 1988-16A, at 3 (Dep't of Labor Dec. 19, 1988).

18.     The choice of a particular investment is considered imprudent, for example, if it provides the plan "with less return, in comparison to risk, than comparable investments available to the plan, or if [it] involve[s] greater risk . . . than other investments offering a similar return."  *Id.*

19.     In order to make that assessment, ERISA fiduciaries should carefully review a fund's performance history as compared to other comparable funds in the same category alongside various other factors such as the experience, qualifications, and tenure of the fund's portfolio manager.

20.     These factors are important considerations to the overall risk assessment because consistent performance history and investment strategy are reasonable indicators of future performance as concerns retirement investing – whereas newly launched funds, with no performance history, and established funds, with a history of inconsistent performance or substantial variation from market benchmarks, are inherently riskier investments.

21.     The duties and obligations of ERISA plan fiduciaries are notably ongoing and continuous in nature.  Accordingly, the duty of prudence extends well beyond the initial selection of plan investments; it also imposes a continuing obligation on fiduciaries to monitor plan investments.  *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset."); *id.* at 530 ("[T]he duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]"); *accord Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022).  Consistent with these obligations, ERISA fiduciaries must evaluate and scrutinize plan investments on a reasonably regular basis to assess the risk of loss, alongside current and projected returns, as compared to other alternative investment options on the market.  *See id.*

22.     In addition and consistent with the statutory mandate that plan fiduciaries must discharge their duties for the "exclusive purpose" of providing benefits to participants and "defraying reasonable expenses of administering the plan," 29 U.S.C. §1104(a)(1)(A)(ii), ERISA plan fiduciaries must also ensure that any fees charged for investment management, administrative recordkeeping, and/or any other such services paid for with plan assets, are both necessary and reasonable.  *See* Advisory Opinion, Docket No. 1997-16A, at 5 (Dep't of Labor May 22, 1997)("In this regard, the responsible [p]lan fiduciaries must assure that the compensation paid directly or indirectly by the [p]lan . . . is reasonable, taking into account the services provided . . . .").

23.     To that end, plan fiduciaries "must obtain sufficient information regarding any fees or other compensation" charged for fund management, recordkeeping, and other such services in order to ensure that such compensation "is no more than reasonable" considering the scope and nature of those services.  *Id.; see also* Advisory Opinion, Docket No. 2013-03A (Dep't of Labor July 3, 2013) .

24.     "Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important [and ongoing] part of a fiduciary's responsibility."  *Understanding Retirement Plan Fees & Expenses*, U.S. DEP'T OF LABOR, at 1 (Sept. 2021), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf.

25.     Since the costs of administering a plan are not always easy to discern and/or readily identifiable to participants, fiduciaries have a special responsibility here and must develop a sophisticated understanding of how costs accrue against plan assets and evaluate the differences in fees and services between prospective service providers on a regular basis:

> While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable."  After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

> In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not.  Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement.  Others charge separately for individual services.  Compare all services to be provided with the total cost for each provider.  Consider whether the estimate includes services you did not specify or want.  Remember, all services have costs.

> Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan.  For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services.  There also may be sales and other related charges for investments offered by a service provider.

*Meeting Your Fiduciary Responsibilities*, U.S. DEP'T OF LABOR, at 6 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

**B.      Prohibited Transactions (29 U.S.C. §1106)**

26.      ERISA plan fiduciaries are also subject to the categorical rule against "prohibited transactions" described at 29 U.S.C. §1106.

27.      As is relevant here, that section provides that a plan fiduciary "shall not cause the plan to engage in a transaction" with actual or imputed knowledge "that such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest[,]" 29 U.S.C. §1106(a)(1)(C); or "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[,]" 29 U.S.C. §1106(a)(1)(D); and/or any other "deal[ing] with the assets of the plan in his own interest or for his own account," 29 U.S.C. §1106(b)(1).

28.      Although such dealings would in most circumstances constitute an independent violation of the fiduciary duties set forth at 29 U.S.C. §1104(a)(1), the statutory scheme gives rise to separate causes of action for "prohibited transactions" at 29 U.S.C. §1106 because of the inherent risk of potential fiduciary abuses presented by those circumstances.

**C.      Liability for Fiduciary Breach (29 U.S.C. §1109) and Co-Fiduciary Breaches (29 U.S.C. §1105)**

29.      ERISA plan fiduciaries that breach these "responsibilities, obligations, or duties . . . shall be personally liable" for "any losses to the plan resulting from each such breach[.]"  29 U.S.C. §1109.

30.      In addition, ERISA plan fiduciaries may also be held liable for knowingly enabling, participating in, undertaking to conceal, and/or otherwise turning a blind eye to a breach of these obligations by any other "co-fiduciary," or by merely failing to undertake appropriate affirmative steps or remedial efforts upon learning that such a breach has occurred or is occurring.  29 U.S.C. §1105.

## FACTUAL ALLEGATIONS

31.     The FHI Employees Profit Sharing/401(k) Plan (the "Plan") is a "defined contribution plan" within the meaning of 29 U.S.C. §1002(34).

32.     Defined contribution retirement plans allow employees to contribute a percentage of their pre-tax earnings to an individual account through which participants may then select investments from an array of fund offerings and/or other investment options chosen by the plan's fiduciaries.[1]

33.     According to a Form 5500 that Defendants filed with the U.S. Department of Labor, the Plan had total assets valued at approximately $660,029,613 and 1,814 participants with account balances at year-end as of December 31, 2021.

34.     In the same Form 5500 filing, Defendants indicated that participants "have the ability to direct the investments of their . . . accounts into any of the mutual funds or the collective investment fund offered by the Plan."

35.     Notably, however, those investment offerings are limited to certain proprietary funds under FHI's management (as stated in a Plan document, "*all FHI Funds offered by the Plan . . . are advised or managed by subsidiaries of FHI*"), and participants are only able to invest in those funds that are offered and available through the Plan.  [Emphasis added].

---

[1]     The defined contribution model differs from traditional pension plans in that the amount of retirement benefits an employee receives is determined by the value of an employee's individual account at retirement age, as opposed to being defined and guaranteed by the employer.  Under the traditional pension model, the employer bears full responsibility for funding and managing retirement plan assets in a manner that will enable it to fulfill any commitments made to its employees.  In a defined contribution plan, the employer may contribute towards an employee's retirement account (*e.g.*, 401k matching), and remains responsible for managing the retirement plan's assets – but the employee ultimately bears primary responsibility for funding the account and also bears investment risks.

**A.    Defendants' Self-Serving and Imprudent Selection of FHI Proprietary Funds as Plan Investments Indicates Defendants Employed a Defective Fiduciary Process**

36.    Throughout the Relevant Period, Defendants limited the selection of investment options available through the Plan to a subset of FHI Proprietary Funds that are managed, marketed, and sold by FHI in its ordinary course of business.

37.    Specifically, the FHI Proprietary Funds, offered to Plan participants during the Relevant Period, included the following mutual funds and/or so-called collective trust funds:

### Table 1.  FHI Proprietary Funds
Plan Assets in Fund
(2017 – 2021)

| FHI Proprietary Funds | Plan Assets in Fund | | | | |
|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **2021** |
| FHI Capital Income Fund (CAPSX) | $ 4,581,595 | $ 4,194,997 | $ 4,614,314 | $ 4,234,993 | $ 4,604,288 |
| FHI Emerging Markets Debt Fund (EMDIX) | $ 2,035,923 | $ 1,907,821 | $ 1,981,492 | $ 2,177,962 | $ 2,108,684 |
| FHI Capital Preservation Fund Y (FECAPY) | $ 43,709,562 | $ 42,935,032 | $ 44,933,609 | $ 49,953,759 | $50,138,897- |
| FHI Intl Leaders Fund (FGFLX) | $ 32,548,350 | $ 25,271,794 | $ 30,954,574 | $ 33,548,715 | $ 36,052,830 |
| FHI MDT Mid Cap Growth Strategies Fund (FGSIX) | $ 38,210,722 | $ 35,028,239 | $ 42,643,509 | $ 53,784,273 | $ 61,196,547 |
| FHI Global Total Return Bond IS (FGTBX) | $ 1,234,769 | $ 1,387,236 | $ 1,555,169 | $ 1,568,763 | $ 1,549,916 |
| FHI Short-Intermediate Govt Fund (FIGTX) | $ 2,087,270 | $ 2,363,534 | $ 3,958,069 | $ 5,626,049 | $ 4,384,697 |
| FHI Institutional High Yield Bond Fund (FIHBX) | $ 19,233,570 | $ 17,820,432 | $ 20,117,090 | $ 21,103,420 | $ 21,701,938 |
| FHI Max-Cap Index Fund (FISPX) | $ 36,537,985 | $ 32,725,255 | $ 40,454,172 | $ 44,176,272 | $ 56,826,297 |
| FHI Mid-Cap Index Fund (FMCRX) | $ 8,958,844 | $ 7,685,335 | $ 10,208,865 | $ 10,759,793 | $ 17,109,442 |
| FHI Absolute Return Fund (FMIX) | $ 3,052,717 | $ 1,606,019 | - | - | - |
| FHI MDT Large Cap Value IS (FMSTX) | $ 37,178,867 | $ 33,324,590 | $ 37,515,203 | $ 36,340,997 | $ 45,400,232 |
| FHI Total Return Bond Fund IS (FTRBX) | $ 12,948,715 | $ 14,562,275 | $ 16,462,603 | $ 20,289,912 | $ 20,603,620 |

| | | | | |
|---|---|---|---|---|
| FHI Total Return Govt Bond Fund (FTRGX) | $ 3,267,437 | $ 3,931,757 | $ 4,427,902 | $ 7,945,139 | $ 5,795,940 |
| FHI International Small-Mid Company Fund (ISCIX) | $ 12,403,834 | $ 9,640,133 | $ 12,768,208 | $ 17,538,478 | $ 19,051,025 |
| FHI Intl Strategic Value Dividend Fund (IVFIX) | $ 4,740,920 | $ 3,610,527 | $ 4,763,407 | $ 4,943,256 | $ 6,298,312 |
| FHI Kaufmann Fund (KAUIX) | $ 38,298,879 | $ 40,158,528 | $ 49,995,465 | $ 61,278,484 | $ 60,611,701 |
| FHI Kaufmann Small Cap Fund (FKAIX) | $ 21,345,464 | $ 27,501,361 | $ 36,782,187 | $ 53,217,064 | $ 51,790,975 |
| FHI Kaufmann Large Cap Fund (KLCIX) | $ 18,756,611 | $ 17,930,282 | $ 26,258,557 | $ 35,134,291 | $ 37,373,602 |
| FHI Equity-Income Fund (LEISX) | $ 5,858,745 | $ 4,729,066 | $ 5,412,826 | $ 5,230,568 | $ 6,607,962 |
| FHI Prudent Bear Fund (PBRIX) | $ 1,275,643 | $ 1,593,414 | $ 954,195 | $ 1,027,181 | $ 965,144 |
| FHI MDT All Cap Core Fund (QIACX) | $ 17,639,436 | $ 17,955,320 | $ 21,375,758 | $ 24,611,698 | $ 32,676,380 |
| FHI MDT Balanced Fund (QIBGX) | $ 10,577,931 | $ 11,049,991 | $ 13,048,174 | $ 15,441,936 | $ 19,044,931 |
| FHI MDT Small Cap Core Fund (QISCX) | - | - | $ 609,405 | $ 1,523,506 | $ 4,504,487 |
| FHI Global Allocation Fund (SBFIX) | $ 5,842,259 | $ 5,345,769 | $ 7,946,066 | $ 8,344,813 | $ 7,661,249 |
| FHI Strategic Income Fund (STISX) | $ 5,374,411 | $ 4,778,825 | $ 4,953,987 | $ 5,504,126 | $ 5,784,911 |
| FHI Strategic Value Dividend Fund (SVAIX) | $ 23,115,509 | $ 19,143,464 | $ 23,458,499 | $ 22,851,728 | $ 28,738,971 |
| FHI Clover Small Value Fund (VSFIX) | $ 9,001,774 | $ 6,838,767 | $ 7,233,282 | $ 7,743,382 | $ 10,840,562 |

38.     With the exception of a so-called "brokerage window"[2] built into the Plan, these FHI Proprietary Funds were the ***only*** investment options offered in the Plan throughout the Relevant Period.

39.     No other investment options were included in the selection of fund offerings for the Plan at any point during the Relevant Period – either from FHI's own proprietary lineup or from

---

[2]     A brokerage window is a facility that provides 401(k) plan participants with the option to buy and sell securities through a self-directed brokerage platform.  As a practical matter, only a small percentage of plan participants (typically those with higher salaries or significant assets) make use of such self-directed brokerage options.

the vast array of other fund options offered by other investment managers in the highly competitive market for 401(k) retirement plan services.

### 1. The Selection of Plan Investments Was Tainted by Self Interest

40.     Although the inclusion of proprietary investment options in a company's retirement plan does not necessarily amount to a *per se* fiduciary breach, it may be an indicia of self-dealing that is wholly inconsistent with the fiduciary duties of loyalty and prudence – particularly where as here, the plan sponsor's commercial interests are advanced by that decision, or in combination with other circumstances tending to suggest the plan's investment selection and retention process is otherwise imprudent. *See Hughes*, 142 S. Ct. at 742 ("Because the content of the duty of prudence turns on 'the circumstances'[,] . . . the appropriate inquiry will necessarily be context specific.") (quoting Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 425 (2014)).

41.     Here, those circumstances overwhelmingly support an inference that Defendants' process for making investment decisions was used wrongfully to advance the interests of FHI's proprietary funds business — even if that meant subordinating the interests of Plan participants.[3]

42.     As an initial matter, the inclusion of these funds in the Plan necessarily advanced Defendants' commercial and financial interests; both by generating fee-based revenues to FHI and

---

[3]     Plaintiff did not have knowledge of all material facts (including, among other things, the cost and value of investment, management, and recordkeeping services selected by Plan fiduciaries, as compared to those of similarly sized plans) necessary to understand that Defendants had breached their fiduciary duties and engaged in other ERISA violations, until shortly before this suit was filed. Further, Plaintiff did not possess actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's service providers) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

by providing other indirect benefits such as investor participation and volume which bolstered FHI's proprietary fund business.

43.    That Defendants selected FHI Proprietary Funds to the exclusion of any and all other investment options on the market is not coincidental. Given the widespread availability of other suitable investment options offered by non-FHI affiliated competitors in the marketplace, it is implausible that Defendant's exclusion of all other funds offered by its competitors was the result of an impartial fiduciary decision-making process. And yet, Plan participants like Plaintiff were only ever able to select from investment options in funds that were under FHI's management, and thereby generated fee-based revenues and other benefits to Defendants' investment management business.

### 2.    The Plan's Investment Selection and Retention Process Was Substantively and Procedurally Imprudent

44.    Setting aside Defendants' motives for packing the Plan with FHI's proprietary offerings, Defendants' collective decision to exclude all other unaffiliated investment products on the market from the Plan was imprudent, both substantively and procedurally – thereby amounting to a breach of the duty of prudence, irrespective of whether it was also motivated by self-interest.

45.    Reasonably prudent ERISA 401(k) plan fiduciaries recognize that no one investment management firm is good at everything; some excel at providing fixed income investment products, others at equity investment products, and still others at international and emerging market investment products.

46.     Prudent fiduciaries for large retirement plans take a "best-of-breed" approach, carefully comparing vendors in the retirement plan investment product market to provide a suitable and appropriately low-cost and diversified array of investment options.[4]

47.     A plan investment lineup featuring exclusively a retirement plan sponsor's own proprietary retirement investment funds is suspect from a prudence perspective if for no other reason than that it plainly contravenes the "best-of-breed" approach.

48.     In addition, the 100% proprietary investment lineup at issue here supports an inference of procedural imprudence insofar as it indicates that Defendants did not "appropriate[ly] consider" or carefully evaluate other alternative investment options in the decision-making process,[5] and could not have faithfully followed a suitable Investment Policy Statement ("IPS") outlining the process of diversifying the Plan investments to minimize the risk of large investment losses.[6]

49.     In short, it is impossible that each and every one of the FHI Proprietary Funds in the Plan was chosen pursuant to a rigorous evaluation and screening process involving an

---

[4]     *See* Josh Cohen & Ben D. Jones, *Seven Attributes of an Excellent Defined Contribution Plan*, PLAN CONSULTANT, Winter 2013, at 36, 39, https://www.asppa.org/sites/asppa.org/ files/PDFs/Magazines/Plan%20Consultant/PC-Winter13-Cohen.pdf.

[5]     *See* 29 C.F.R. §2550.404a-1(b)(2).

[6]     Although failing to follow an appropriate IPS is not a freestanding ERISA violation, it does tend to show significant deviation from industry norms and best practices. *See, e.g.*, *2020 DC Survey: Plan Benchmarking*, PLANSPONSOR (Nov. 9, 2020), https://www.plansponsor.c om/research/2020-dc-survey-plan-benchmarking/?pagesec=3#2020%20Survey (showing that 94% of plans with assets over $200 million have adopted an IPS); *see also* Chris Carosa, *7 Basic Questions Concerning 401(k) Investment Policy Statements*, FORBES (Nov. 18, 2019), https://www.forbes.com/sites/chriscarosa/2019/11/18/7-basic-questions-concerning-401k- investment-policy-statements/?sh=69f2e7ea3b8c ("[T]he U.S. Department of Labor (DOL), which has enforcement authority for ERISA has said that having [an IPS] is consistent with the fiduciary obligations set by the law. Thus, this is considered a best practice in essence, as it establishes guidelines for selecting and monitoring plan investments while providing a framework for making critical fiduciary decisions.").

appropriately detailed comparison to similar funds offered by competitor investment fund vendors to see how the FHI Proprietary Funds compared to other vendors' funds with respect to performance history and other relevant metrics.[7]

50.     Circumstances surrounding Defendants' addition of certain proprietary funds at various points throughout the Relevant Period are another telling aspect of Defendants' fiduciary breaches here – viz, some of those investment options were added to the Plan's lineup as newly launched funds with little to no performance history.

51.     For example, the FHI International Leaders Fund (FGFLX) and the FHI Kaufmann Large Cap Fund (KLCIX) were both added as new investment options for the 2014 Plan year, just a few months after being launched on August 5, 2013.

52.     Similarly, the FHI MDT Large Cap Value IS Fund (FMSTX) was launched on June 29, 2016, and added as a new investment option shortly thereafter.  By the end of that same year (*i.e.*, just six months later) the FMSTX fund held over $31 million in Plan assets.

53.     The inclusion and promotion of these newly launched FHI Proprietary Funds was imprudent, as they were then essentially untested investments and chosen over a vast array of other more well-established funds with proven track records that were then widely-available through non-FHI affiliated competitors in the market. Indeed, it suggests that other more prudent

---

[7]     *See, e.g.*, C. Frederick Reish, Bruce L. Ashton, & Summer Conley, The Prudence Standard: Affiliated Products and Services (DrinkerBiddle June 2011), http://docplayer.net/12249737-The-prudence-standard-affiliated-products-and-services.html ("Thus, to meet the prudent process requirement, fiduciaries must thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained. This means considering competing funds to determine which fund should be included in the plan's investment line-up. As explained by the DOL in the preamble to the qualified default investment alternative regulations, '[a] fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality *of **competing providers and investment products***, as appropriate.'") (emphasis in original) (citing 72 Fed. Reg. 60453 (Oct. 24, 2007)).

alternatives were either not considered at all and/or deliberately passed over for inferior options that served to advance FHI's commercial interests by treating Plaintiff and other participants in the Plan as captive investors to prop up Defendants' newly launched funds.  Either way, Defendants' selection of investments for inclusion in the Plan was neither prudent nor reasonably consistent with its obligation to act solely in the interests of Plan participants.

**B.    Defendants' Failure to Monitor, Flag, and Remove Investments that Were Plagued by Chronic Underperformance Issues and/or Unreasonably Excessive Fees Shows that Defendants' Fiduciary Process Was Disloyal and Imprudent**

54.    Defendants' fiduciary lapses were continuous throughout the Relevant Period, extending well beyond mere deficiencies in the initial decision-making process and selection of FHI Proprietary Funds for inclusion in the Plan.

55.    Even assuming *arguendo* that each and every FHI Proprietary Fund selected by the Plan's fiduciaries was an appropriately prudent investment offering at the time of its inclusion in the Plan, subsequent performance issues and outsized costs as compared to other alternative investment choices should have prompted the removal of those investment options from the Plan by any reasonably prudent ERISA fiduciary.[8]

**1.    Persistent Underperformance**

56.    As measured against comparable funds that Plan fiduciaries had themselves identified as appropriate benchmarks, the overwhelming majority of FHI Proprietary Funds offered through the Plan were chronic underperformers throughout the Relevant Period:

---

[8]        *See, e.g.*, *Tibble*, 575 U.S. at 529; *Hughes*, 142 S. Ct. at 741.

**Table 2.  FHI Proprietary Funds Versus Benchmarks**
Average Annualized 5-Year Total Return
as of Sept. 30, 2019

| FHI Proprietary Fund | | Benchmark Fund | | VAR (%) |
|---|---|---|---|---|
| FHI Total Return Bond Fund IS (FTRBX) | 3.59% | Bloomberg Barclays US Universal TR USD | 3.62% | - 0.03% |
| FHI Short-Intermediate Govt Fund (FIGTX) | 1.39% | Morningstar US Short-Term Govt Bond | 1.47% | - 0.08% |
| FHI Capital Preservation Fund Y (FECAPY) | 1.47% | Bloomberg Barclays US Govt/Credit | 1.58% | - 0.11% |
| FHI Max-Cap Index Fund (FISPX) | 10.57% | Morningstar US Large Cap TR USD | 11.05% | - 0.48% |
| FHI Clover Small Value Fund (VSFIX) | 4.19% | Morningstar US Small Value TR USD | 5.08% | - 0.89% |
| FHI Mid-Cap Index Fund (FMCRX) | 8.58% | Morningstar US Mid Cap TR USD | 9.83% | - 1.25% |
| FHI Kaufmann Large Cap Fund (KLCIX) | 12.01% | Morningstar US Large Growth TR USD | 13.39% | - 1.38% |
| FHI MDT Large Cap Value IS (FMSTX) | 7.12% | Morningstar US Large Value TR USD | 8.76% | - 1.64% |
| FHI Strategic Value Dividend Fund (SVAIX) | 7.02% | Morningstar US Large Value TR USD | 8.76% | - 1.74% |
| FHI Capital Income Fund (CAPSX) | 2.78% | S&P Target Risk Conservative TR USD | 4.55% | - 1.77% |
| FHI Intl Leaders Fund (FGFLX) | 2.29% | Morningstar Global Markets ex-US GR USD | 4.20% | - 1.91% |
| FHI Emerging Markets Debt Fund (EMDIX) | 2.29% | Morningstar Emerging Markets Composite B | 5.01% | - 2.72% |
| FHI Global Total Return Bond IS (FGTBX) | 0.13% | Morningstar Global Markets ex-US Govt | 3.43% | - 3.3% |
| FHI Global Allocation Fund (SBFIX) | 4.08% | Wilshire 5000 Total Market TR USD | 10.58% | - 6.5% |
| FHI Intl Strategic Value Dividend Fund (IVFIX) | -0.17% | Morningstar Global Markets ex-US GR USD | 4.20% | - 4.03% |
| FHI Equity-Income Fund (LEISX) | 4.73% | Morningstar US Large Value TR USD | 8.76% | - 8.03% |
| FHI Prudent Bear Fund (PBRIX) | - 11.87% | ICE BofAML US Dollar 3-month Deposit Off | 1.24% | - 13.11% |

### 2.     Excessive Fees

57.     Fund underperformance aside, FHI also charged outsized management fees to Plan participants as compensation for routing their retirement nest eggs into Defendants' subpar proprietary funds.

58.     Despite the general maxim that compensation should generally correlate with performance, subpar returns did not stop FHI from assessing substantially higher fees than other comparable funds in the market for investment management services.

59.     Indeed, the FHI Proprietary Funds offered to Plan participants throughout the Relevant Period had consistently higher expense ratios (and consistently lower returns), as compared to similar non-FHI-affiliated funds and indices:

**Table 3.  Underperformance and Excessive Fees**
**FHI Proprietary Funds vs Comparable Alternative Investments**
Average Annualized 5-Year Total Return
as of Dec. 31, 2022

| FHI Proprietary Fund | | | Comparable Alternative Investment | | | FHI Underperformance and Cost Variance | |
|---|---|---|---|---|---|---|---|
| | 5Y Return | Expense Ratio | | 5Y Return | Expense Ratio | FHI Return VAR (%) | FHI Fees VAR (%) |
| FHI Emerging Markets Debt Fund (EMDIX) | -1.47% | 0.94% | Vanguard Emerging Markets Bond Admiral (VEGBX) | 2.98% | 0.40% | *- 4.45%* | *+ 0.54%* |
| FHI Equity-Income Fund (LEISX) | 5.11% | 0.87% | JPMCB Value Plus Fund (F00000MWGK) | 15.77% | 0.01% | *- 10.66%* | *+ 0.86%* |
| FHI Global Total Return Bond IS (FGTBX) | -2.17% | 0.79% | Dodge & Cox Global Bond (DODLX) | 2.41% | 0.45% | *- 4.58%* | *+ 0.34%* |
| FHI Global Allocation Fund (SBFIX) | 2.47% | 0.86% | Vanguard Global Wellington (VGWLX) | 5.59% | 0.45% | *- 3.12%* | *+ 0.41%* |
| FHI Intl Strategic Value Dividend Fund (IVFIX) | 2.47% | 0.86% | Goldman Sachs Intl Equity Income (GSIKX) | 4.01% | 0.85% | *- 1.54%* | *+ 0.01%* |
| FHI Kaufmann Fund (KAUIX) | 5.32% | 1.51% | BlackRock Mid-Cap Growth Equity (CMGIX) | 7.98% | 0.80% | *- 2.66%* | *+ 0.71%* |

| FHI Max-Cap Index Fund (FISPX) | 8.98% | 0.37% | BlackRock Equity Index Fund CF (SAUSA004GB) | 14.18% | 0.00% | *- 5.20%* | *+ 0.37%* |
|---|---|---|---|---|---|---|---|
| FHI Mid-Cap Index Fund (FMCRX) | 6.46% | 0.32% | Blackrock US Equity Markets Fund CF (SAUSA004GB) | 20.76% | 0.00% | *- 14.30%* | *+ 0.32%* |
| FHI Short-Intermediate Govt Fund (FIGTX) | -0.11% | 0.60% | Vanguard Short Term Federal Admin (VSGDX) | 0.80% | 0.10% | *- 0.91%* | *+ 0.50%* |
| FHI Strategic Income Fund (STISX) | 1.04% | 0.64% | Thornburg Strategic Income R6 (SPUSA06471) | 2.77% | 0.40% | *- 1.73%* | *+ 0.24%* |
| FHI Total Return Bond Fund IS (FTRBX) | 0.89% | 0.39% | American Funds Strategic Bond R6 (F0000WFZG) | 2.34% | 0.32% | *- 1.45%* | *+ 0.07%* |

60.     To put things into perspective, the handful of examples on the foregoing chart represent an estimated $38 million in combined losses borne by Plan participants, losses that were easily avoidable and represent only a fraction of the overall harm here.

61.     Per the FHI Notice of Investment Returns and Fee Comparison from September 30, 2017, the Plan disclosed the general administrative services expense for recordkeeping as $79.00 per participant.

62.     As demonstrated by the examples in the table below, recordkeeping services for plans of comparable asset size were typically in the range of $45 to $50 per participant during the Relevant Period; a range that would have been far more reasonable here based on the plans' features, the nature of the administrative services provided by the plans' recordkeepers, the number of participants in the plans, and the recordkeeping services market.

**Table 4.  Reasonable Recordkeeping Fees for Plans of Comparable Size**

| Plan Name | Plan Year | Assets | Participants | Recordkeeping Fees (per participant) |
|---|---|---|---|---|
| LLNS 401(k) Savings Plan | 2020 | $613,000,000 | 2,014 | $49.06 |
| TIBCO Software Inc 401(k) Savings Plan | 2021 | $575,000,000 | 2,477 | $37.67 |
| Shook, Hardy, & Bacon 401(k) Profit Sharing Plan | 2021 | $596,000,000 | 1,716 | $45.06 |
| Sulzer Employee Savings Plan | 2021 | $550,000,000 | 2,420 | $47.78 |

63.    The following table illustrates the effect of these outsized fees.  As demonstrated below, participants were overcharged at least half a million dollars in recordkeeping fees during the Relevant Period:

**Table 5.  Excess Recordkeeping Fees**

| Plan Year | participants | Assets | Recordkeeping Fees | Per participant Fee | Reasonable Per participant Fee | VAR ($) Excessive Fees |
|---|---|---|---|---|---|---|
| 2017 | 1,805 | $460,747,970 | $161,975 | $89.74 | $50.00 | $71,725 |
| 2018 | 1,806 | $432,437,003 | $152,350 | $84.36 | $50.00 | $62,050 |
| 2019 | 1,800 | $509,016,324 | $143,240 | $79.58 | $50.00 | $53,240 |
| 2020 | 1,819 | $589,710,915 | $144,434 | $79.40 | $45.00 | $62,579 |
| 2021 | 1,814 | $660,029,613 | $144,797 | $80.00 | $45.00 | $63,349 |

64.    In other words, persistent underperformance was coupled with high Plan-related fees.  And although this unfortunate dynamic was imposed by the Plan's fiduciaries, the costs were borne entirely by the Plan's participants, whose retirement savings were essentially captive investments in the FHI Proprietary Funds.  Meanwhile, numerous other recordkeepers in the marketplace were capable of providing the same level of service at lesser costs.  *See Hughes v. Northwestern Univ.*, 63 F.4th 615, 632 (7th Cir. 2023) ("recordkeeping services are fungible and that the market for them is highly competitive.").

>   **3.    Defendants' Failure to Remove the FHI Proprietary Funds from the
>       Plan Supports the Inference that Defendants' Fiduciary Process Was
>       Imprudent and Disloyal**

65.    As one might expect, this panoply of underperformance issues and outsized costs led to substantial attrition from the FHI Proprietary Funds, as other, non-captive investors exited their positions in the FHI Proprietary Funds and moved their savings into objectively superior alternative investment offerings on the market.

66.    The following illustrations are provided to offer a few concrete examples of these negative outflows – but the general pattern of investor attrition was more or less consistent across nearly all of the FHI Proprietary Funds offered in the Plan:

**Table 6.  Investment Flows**









67.     Simply put, the only investors that remained in the FHI Proprietary Funds during the instant timeframe were those that failed to realize the value proposition in these investment offerings was objectively unreasonable and subpar as compared to other readily available options on the market and those that were essentially captive investors with no other options, *e.g.*, the Plan participants.

68.     As ERISA plan fiduciaries, it was the responsibility of Defendants to know better; at minimum, Defendants had a duty to acknowledge that the FHI Proprietary Funds were a poor choice compared to other funds in the market and to act accordingly in the interests of Plan participants by removing any imprudent investment offerings from the Plan's lineup.

69.     Defendants utterly failed in that regard as well, thereby breaching their fiduciary obligations to the Plan's participants throughout the Relevant Period.  Instead of abiding by their fiduciary mandate to prudently monitor, flag, and remove imprudent investments from the Plan, Defendants kept the Plan and its participants invested in the poorly performing FHI Proprietary Funds, even as other prudent investors were exiting these funds.

70.     Moreover, although Defendants' motives for adhering to the FHI Proprietary Fund lineup through this period cannot be definitively established without discovery, there are additional factors tending to suggest that the decision was more than a mere lapse of judgment or dereliction of their duties of prudence (*i.e.*, that they did so knowingly and purposefully to serve FHI's corporate interests in retaining assets under management).

71.     For example, the FHI Proprietary Funds were so problematic as compared to other investment offerings on the market that even the funds' own managers were pulling their investments from these funds in some instances.  As of November 30, 2022, for example, only three of the six members of the management team for the FHI Capital Income Fund (CAPSX) held their own assets in the fund.  By January 31, 2023, that number had dwindled further, with only one member of the fund's management team holding assets in the fund.

72.     Even as the fund's own managers and non-captive third-party investors were pulling out of the instant retirement investment funds, Defendants retained the FHI Capital Income Fund (CAPSX) in its limited selection of Plan investment offerings.

### 4.    The Imprudent Selection and Retention of FHI Capital Preservation Fund Y (FECAPY) as the Plan's Designated QDIA

73.     The selection and retention of FHI Capital Preservation Fund Y (FECAPY) as the Plan's qualified default investment alternative ("QDIA") is another example of Defendants' dereliction of their ERISA fiduciary duties.

74.     Although participants in defined contribution plans have the ability to allocate contributions across the various investment options offered through the Plan, reasonably prudent fiduciaries may opt to designate a QDIA for individual participants that have not made any such investment elections.

75. Upon information and belief, the FHI Capital Preservation Fund Y (FECAPY) was the designated QDIA throughout the Relevant Period.

76. If Defendants had an appropriate fiduciary process in place, they would have made different investment choices for the Plan. For example, had Defendants followed the Department of Labor's QDIA guidelines and considered multiple unaffiliated investment funds as part of their fiduciary process for the Plan, the FHI Capital Preservation Fund Y (FECAPY) would not have been the appropriate choice in any event.

77. As demonstrated below, the FHI Capital Preservation Fund Y (FECAPY) experienced significant attrition from 2016 to 2021. As approximately 600 investors and over $1 billion in assets exited the fund due to chronic performance issues, the Plan's position in this fund continually increased.

**Table 7.  FHI Capital Preservation Fund Y (FECAPY)**

|  | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 |
|---|---|---|---|---|---|---|
| **PLAN ASSETS IN FUND** | $44,577,071 | $43,709,562 | $42,935,032 | $44,933,609 | $49,946,782 | $50,131,308 |
| **TOTAL ASSETS IN FUND** | $5,104,049,741 | $4,364,233,945 | $3,955,496,653 | $3,714,307,539 | $4,107,708,602 | $3,459,991,222 |

78. Despite all indications that the FHI Capital Preservation Fund Y (FECAPY) was being abandoned by unaffiliated investors, Defendants did nothing to prevent the steady increase of Plan assets flowing into this fund during the same period.

**C.    Defendants' Adherence to FHI's Proprietary Fund Lineup When Other Investment Vendors Offered Better-Performing Alternative Funds Indicates a Defective Fiduciary Process**

79. Throughout the Relevant Period, Defendants continuously failed to diversify the Plan's investments and/or procure objectively superior alternatives that were readily available

through other vendors in the market to replace the poorly performing FHI Proprietary Fund offerings in the Plan.

80.     Defendants' neglect in that regard is striking when viewed alongside the highly fungible and competitive nature of the market for investment management services, and Defendant fiduciaries' advantageous position as large purchaser within that market. As fiduciaries of a Plan with over $600 million in assets, Defendants had tremendous bargaining power to obtain superior investments from the vast array of readily available fund options from other vendors in the market.

81.     At all times during the Relevant Period, there have been many non-FHI-branded and well-managed investment options in the 401(k)-plan marketplace available to the Plan. Such options include registered mutual funds, exchange-traded funds, and non-registered funds such as bank collective or common trusts and insurance company pooled separate accounts.

82.     As demonstrated by Table 8, below, Defendants had an abundance of non-FHI branded options to choose from when curating the investment lineup for the Plan. By way of example, for each of the FHI Proprietary Funds in this chart, there were numerous comparable investment options being offered by other vendors – including those examples listed from the same Morningstar Peer Group that consistently outperformed Defendants' proprietary offerings:

**Table 8.  Superior Alternative (Non-FHI) Funds by Category**

Average Annualized 5-Year Total Return
as of Dec. 31, 20222

| FHI Proprietary Fund | | Superior Alternative Fund (Non-FHI) Option | | Outperformed FHI by | Other Funds in this Category |
|---|---|---|---|---|---|
| | 5Y Return | | 5Y Return | | |
| FHI Max-Cap Index Fund (FISPX) | 8.98% | Morningstar US Large Cap TR USD | 9.41% | *+ 0.43%* | **1,382** |
| FHI Equity-Income Fund (LEISX) | 5.11% | Morningstar US Large Value TR USD | 7.44% | *+ 2.33%* | **1,207** |
| FHI Strategic Value Dividend Fund (SVAIX) | 5.92% | Morningstar US Large Value TR USD | 7.44% | *+ 1.52%* | **1,207** |

| | | | | | |
|---|---|---|---|---|---|
| FHI Total Return Bond Fund IS (FTRBX) | 0.89% | Morningstar US Core TR USD | 9.46% | *+ 8.57%* | **621** |
| FHI Kaufmann IS | 5.32% | Morningstar US Mid Growth TR USD | 8.40% | *+ 3.08%* | **586** |
| FHI Capital Income Fund (CAPSX) | 2.70% | Morningstar Mod Conservative Target Risk TR USD | 2.79% | *+ 0.09%* | **465** |
| FHI Global Allocation Fund (SBFIX) | 2.47% | MSCI ACWI NR USD | 5.24% | *+ 2.77%* | **418** |
| FHI Mid-Cap Index Fund (FMCRX) | 6.46% | Morningstar US Mid Cap TR USD | 8.11% | *+ 1.65%* | **405** |
| FHI Strategic Income Fund (STISX) | 1.04% | Morningstar US Core TR USD | 9.46% | *+ 8.42%* | **343** |
| FHI Emerging Markets Debt Fund (EMDIX) | -1.47% | Morningstar Emerging Markets NR USD | -0.30% | *+ 1.17%* | **270** |
| FHI Global Total Return Bond IS (FGTBX) | -2.17% | Morningstar Global Markets ex-US NR USD | 1.07% | *+ 3.24%* | **201** |
| FHI Short-Intermediate Govt Fund (FIGTX) | -0.11% | Schwab Short-Term US Treasury ETF | 0.69% | *+ 0.80%* | **81** |

83.     The fact that none of these objectively superior alternative options were ever included or offered in the Plan further supports the inference that Defendants' fiduciary decision-making process was flawed and defective.

84.     Defendants' failure to meaningfully correct course – despite plain evidence that the Plan's investments were imprudent and in need of diversification – was consistent with the overall pattern of neglect and dereliction of its fiduciary duties to the Plan's participants throughout the Relevant Period.

85.     Indeed, as courts have consistently recognized, prudent and unconflicted plan fiduciaries should know that no one investment fund family necessarily provides prudent retirement fund options across all asset classes and should thus engage in appropriate due diligence in selecting and monitoring each plan investment, including any proprietary funds. *See, e.g.*, *Baker v. John Hancock Life Ins. Co.*, No. 1:20-cv-10397, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[i]n total, ***the long-term retention of a substantial number of underperforming funds*** . . . ***gives rise to a plausible inference of an objectively imprudent monitoring process***. That the retained underperforming funds were all proprietary . . . funds and that in some cases the

plan was one of the last investors propping up a failing fund gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest." [Emphasis added].[9]

86.     Had an appropriate fiduciary process been in place during the Relevant Period, the outcome would have been different.  The deficiency of FHI's proprietary lineup would have been evident if a proper review of these funds' performance record had been conducted on a regular basis.

87.     Defendants' failure to monitor the continued prudence of retaining FHI's proprietary investments in the Plan is egregious in light of the availability of other non-affiliated investment alternatives with the same investment objectives that exhibited a superior performance record as compared to the FHI Proprietary Funds at all times throughout the Relevant Period.

88.     Any reasonably prudent and unconflicted ERISA fiduciary would have taken corrective steps to remove such poorly performing funds from the Plan or replace them with investment options that demonstrated an ability to consistently meet or outperform their benchmark(s) at the time that fiduciary decisions should have been made to protect the Plan.

89.     Yet Defendants continuously failed to re-evaluate the continued prudence of maintaining the FHI Proprietary Funds in the Plan, even as other 401(k) investors exited or decreased their holdings in these funds at the time, and even as a clear majority of the FHI Proprietary Funds underperformed their benchmarks.

---

[9]     *See also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 912 (W.D. Mo. 2017) (denying motion to dismiss in similar ERISA case and observing that "[e]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty through improper decision-making, a claim can survive a motion to dismiss if the court may reasonably infer from what was alleged that the fiduciaries followed a flawed process") (citing Braden v. Wal-Mart Stores, Inc., 588 F.3rd 585 (8th Cir. 2009).

### D.    Losses to the Plan and Its Participants

90.    Defendants' failure to remove or replace the FHI Proprietary Funds as Plan options consistently resulted in low investment returns for the Plan.  Due to Defendants' FHI Proprietary Funds' poor performance and outsized fees, the Plan and its participants sustained millions of dollars in losses every year, throughout the Relevant Period.

91.    Meanwhile, Defendants' fiduciary breaches enabled FHI to prop up its investment management business, ultimately bolstering FHI's bottom-line, market value, and business opportunities at the expense and to the detriment of the Plan.

92.    In effect, Plaintiff and the proposed Class (and their hard-earned retirement investments) were used as a captive investor base to effectuate FHI's self-serving business strategies, which here ran counter to the Plan participants' best interests.

93.    Defendants' Plan-related investment decisions were imprudent, disloyal, and amount to prohibited transactions that mandate disgorgement of fees and other profits wrongfully obtained directly or indirectly – even if the Plan and participants had not otherwise suffered investment losses.

## CLASS ALLEGATIONS

94.    Plaintiff brings this action on behalf of a proposed class defined as:

All participants who invested in the Plan from August 28, 2017 to the present. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

95.    Class certification is appropriate under Federal Rule of Civil Procedure 23(a) and (b)(1), (b)(2), and/or (b)(3).

96.     The class satisfies the numerosity requirement because it is composed of thousands of persons in numerous locations.  The Plan had 1,814 participants with account balances at the end of the 2021 plan year, all of whom invested in the Plan during the Relevant Period.

97.     The number of class members is so large that joinder of all its members is impracticable.

98.     Common questions of law and fact include:

- whether Defendants failed to engage in a proper selection and monitoring process with regard to Plan investments;

- whether Defendants improperly caused the Plan to invest its assets in imprudent funds to the exclusion of other available alternatives;

- whether Defendants breached their fiduciary duties to the Plan by causing the Plan to invest its assets in imprudent funds;

- whether the investment decisions made by Defendants were the result of their failure to make those decisions free of any conflicts and solely in the interests of participants in the Plan;

- whether Defendants breached their fiduciary duties to the Plan by not properly reviewing the Plan's fees and expenses; and

- whether the Plan suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions, and if so, the amount of those losses or undue profits to be disgorged as a result of the fiduciary misconduct alleged herein.

99.     Plaintiff's claims are typical of the claims of the class.  Plaintiff has no interest that is antagonistic to the claims of the class.  Plaintiff understands that this matter cannot be settled

without the Court's approval.  Plaintiff is not aware of another suit pending against Defendants arising from the same circumstances.

100.    Plaintiff will fairly and adequately protect the interests of the class.  Plaintiff is committed to the vigorous representation of the class.  Plaintiff's counsel are experienced in class action and ERISA litigation.

101.    A class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the class is impracticable.  The losses suffered by some of the individual members of the class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all class members similarly as participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.  Plaintiff is unaware of any difficulty in the management of this action as a class action.

102.    This Class may be certified under Rule 23(b) for the following reasons:

103.    First, as an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the Defendants opposing the class, or (B) adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

104.    Second, the action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class.

105.    And third, the action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a class action.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of Fiduciary Duties of Prudence and Loyalty
in Violation of 29 U.S.C. §1104(a)(1)**

(Against All Defendants)

106.    Plaintiff hereby repeats, realleges, and incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

107.    As alleged herein, all Defendants are present and former ERISA plan fiduciaries subject to the duties of loyalty and prudence set forth at 29 U.S.C. §1104(a)(1).

108.    Defendants breached these fiduciary duties by engaging in the conduct described herein, which included, among other things, failing to employ a prudent and loyal process for selecting and monitoring the Plan's investment options, improperly prioritizing FHI's proprietary investments over other superior options offered through unaffiliated vendors, failing to critically or objectively evaluate the performance of the Plan's proprietary investments in comparison to

other investment options, and paying excessive administrative and/or investment management fees.

109.    Instead of acting in the best interests of participants, the conduct and decisions of Defendants were driven by their desire to drive revenues and profits to FHI and to promote FHI's business interests.  Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the participants' interests and for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

110.    Further, each of the actions and omissions described above and elsewhere in this Complaint, demonstrates that Defendants failed to discharge their duties, with respect to the Plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. §1104(a)(1)(B).

111.    The Plan and its participants have suffered substantial losses as a consequence of Defendants' fiduciary breaches, for which Defendants are liable.

112.    Pursuant to 29 U.S.C. §1109, Defendants are therefore liable for any and all losses resulting from each such breach.

113.    Furthermore, because each Defendant knowingly participated in the breach of other co-fiduciaries, enabled others to commit such breaches, and/or failed to undertake appropriate remedial efforts, each Defendant is further liable for all losses attributable to co-fiduciary breaches under 29 U.S.C. §1105.

## COUNT II

### Prohibited Transactions with a Party in Interest
### in Violation of 29 U.S.C. §1106(a)(1)

(Against All Defendants)

114.    Plaintiff hereby repeats, realleges, and incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

115.    As the Plan sponsor and a service provider for the Plan, FHI (including its subsidiaries) is a party in interest under 29 U.S.C. §1002(14).

116.    Under 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

117.    Under 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

118.    Here, Defendants caused the Plan to offer and to continue offering proprietary investment options that enabled FHI to bolster its investment management business and seed that business with Plan assets in furtherance of FHI's corporate strategy and business opportunities, thereby profiting FHI, as opposed to advancing the interests of the Plan.  By selecting and retaining FHI Proprietary Funds, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders. Defendants caused the Plan to engage in these prohibited transactions even though they knew, or should have known at all times throughout the Relevant Period, that such transactions constituted a direct or indirect furnishing of services between the Plan and parties in interest and that such

transactions constituted a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

119.    Furthermore, during the Relevant Period, Defendants caused the Plan to invest in FHI Proprietary Funds to develop and sustain the Company's investment management business (including by using Plan assets as seed money for newly launched proprietary funds), even as other investors were exiting or decreasing their holdings in FHI Proprietary Funds.  Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known, throughout the Relevant Period, that such transactions constituted a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

120.    As detailed above, Defendants maintained numerous FHI Proprietary Funds in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions.

121.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable fees and expenses, thereby resulting in millions of dollars in losses to the Plan and its participants and/or unjust profits for the benefit of the parties in interest; earned not only through the receipt and collection of the fees stemming from the Plan's proprietary investments, but also through the use of Plan assets, invested in FHI Proprietary Funds, to develop and sustain FHI's investment management business during the Relevant Period.

122.    Pursuant to 29 U.S.C. §§1109(a), 1105, 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(a)(1) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT III

**Prohibited Transactions with Fiduciaries
in Violation of 29 U.S.C. § 1106(b)**

(Against All Defendants)

123.    Plaintiff hereby repeats, realleges, and incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

124.    As alleged herein, Defendant FHI is a fiduciary of the Plan within the meaning of 29 U.S.C. §§1002(21) and 1106(b)(1).

125.    As alleged above, Defendants are fiduciaries of the Plan within the meaning of 29 U.S.C. §§1002(21) and 1106(b)(1).

126.    Under 29 U.S.C. §1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

127.    Under 29 U.S.C. §1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

128.    Under 29 U.S.C. §1106(b)(3), a fiduciary shall not receive any consideration for his personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

129.    Throughout the Relevant Period, FHI dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable direct or indirect fees to FHI or its subsidiaries, but also profited from the development of its investment management business due to the Plan's investment in FHI Proprietary Funds, including the Plan assets used to seed FHI's untested proprietary funds, in violation of 29 U.S.C. §1106(b)(1).

130.    Throughout the Relevant Period, Defendants, acting on behalf of FHI, whose corporate interests were adverse to those of the Plan and its participants in transactions involving

the Plan violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain FHI Proprietary Funds that not only generated unreasonable revenue for FHI or its subsidiaries, but also enabled FHI to develop and sustain its investment management business in furtherance of its business ventures and opportunities to the detriment of the Plan and its participants.

131.    Throughout the Relevant Period, FHI received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of 29 U.S.C. §1106(b)(3).  These transactions took place during the Relevant Period and involved fees, commissions, and other similar expenses associated with the Plan's investments in FHI Proprietary Funds.

132.    Based on the foregoing facts, Defendants, each a fiduciary of the Plan, violated 29 U.S.C. §1106(b).  These prohibited transactions took place on an ongoing basis throughout the Relevant Period when FHI or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of FHI's investment management business due to the inclusion of the FHI Proprietary Funds in the Plan.

133.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid unreasonable fees and expenses, in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants and/or unjust profits to the Plan fiduciaries.

134.    Pursuant to 29 U.S.C. §§1109(a), 1105, 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(b) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT IV

### Failure to Monitor Fiduciaries

(Against All Defendants)

135.    Plaintiff hereby repeats, realleges, and incorporates by reference each allegation in the preceding paragraphs as if fully set forth herein.

136.    Upon information and belief, Defendants delegated some or all their fiduciary responsibilities to various other appointed individuals, entities, or parties.

137.    To the extent that Defendants delegated any such fiduciary responsibilities to others, Defendants are further liable for failing to appropriately monitor its delegees to ensure that all delegated tasks were being performed prudently and loyally and in compliance with ERISA's fiduciary standards.  *See* 29 C.F.R. §2509.75-8 (FR-17).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.    A declaration that the Defendants breached their fiduciary duties of prudence and loyalty and engaged in prohibited transactions, in violation of ERISA, 29 U.S.C. §§1104-1106;

B.    An order compelling the disgorgement of all unjust profits resulting either directly or indirectly from Defendants' violations of ERISA;

C.    An order compelling Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA;

D.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

E.    Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the

appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in FHI Proprietary Funds and any other imprudent investments;

F.      An order certifying this action as a class action, designating the class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

G.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary duties, responsibilities, and obligations;

H.      An order awarding Plaintiff and the Class their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

I.      An order awarding such other and further relief as the Court deems equitable and just.


Dated:  August 30, 2023                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                            _s/ Donald A. Broggi_____
                                           Donald A. Broggi (PA85514)
                                           Agatha M. Cole (*pro hac vice* forthcoming)
                                           The Helmsley Building
                                           230 Park Avenue, 17th FloorNew York, NY 10169
                                           Telephone: 212-223-6444
                                           Facsimile:  212-223-6334
                                           dbroggi@scott-scott.com
                                           acole@scott-scott.com

                                           **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                           Garrett W. Wotkyns (*pro hac vice* forthcoming)
                                           8068 East Del Acero Drive
                                           Scottsdale, AZ 85258
                                           Telephone: 480-889-3514
                                           gwotkyns@scott-scott.com

**PEIFFER WOLF CARR KANE**
**CONWAY & WISE, LLP**
Daniel J. Carr (*pro hac vice* forthcoming)
Jamie L. Falgout (*pro hac vice* forthcoming)
1519 Robert C. Blakes Sr. Drive, 1st Floor
New Orleans, LA 70130
Telephone: 504-523-2434
dcarr@peifferwolf.com
jfalgout@peifferwolf.com