**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICHOLAS J. KOROLY, | ) | |
| | ) | No. 2:23-01563 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Judge Robert J. Colville |
| | ) | |
| FEDERATED HERMES INC., the ADMINISTRATIVE COMMITTEE and the INVESTMENT COMMITTEE of the FEDERATED HERMES INC. EMPLOYEES PROFIT SHARING/401(K) PLAN, and JANE and JOHN DOES 1-20, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Robert J. Colville, United States District Judge

Before the Court is a Motion to Dismiss (ECF No. 21) filed by Defendants in this matter. Defendants Federated Hermes, Inc. ("FHI") and the Investment Committee of the Federated Hermes Inc. move to dismiss all counts in Plaintiff's Complaint (ECF No. 1), arguing that Plaintiffs have failed to state a claim upon which relief can be granted. The Court has jurisdiction to rule on this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). The Motion has been fully briefed and is ripe for disposition.

## I. Factual Background & Procedural History

In the Complaint, Plaintiff sets forth the following factual allegations relevant to the Court's consideration of the Motions at issue:

Defendant FHI is a publicly traded investment management company headquartered in Pittsburgh, PA. ECF No. 1 ¶ 10. At some point between August 28, 2017 until the time of the

filing of the Complaint (the "Relevant Period"), Plaintiff, who was during the Relevant Period an employee of FHI, participated in FHI's Employee Profit Sharing/401(k) Plan (the "Plan"), a retirement plan sponsored and administered by FHI. *Id.* ¶¶ 9–10.

The Plan is a defined-contribution plan, in which participants can direct the investment of their accounts among the options the Plan offers. *Id.* ¶¶ 31–34. According to its Form 5500, at the end of 2021, the Plan held approximately $660 million in assets and had 1,814 participants with account balances. *Id.* ¶ 33.

Throughout the Relevant Period, every designated investment option in the Plan was a fund managed by FHI or one of its subsidiaries. *Id.* ¶¶ 35–36. Twenty-eight mutual funds and collective trusts held Plan assets at some point between 2017 and 2021. *Id.* ¶ 37. Except for a self-directed brokerage window, which only a small percentage of Plan participants made use of, participants could only invest in FHI funds and could not invest in any fund offered by another manager. *Id.* ¶¶ 38–39.

According to Plaintiff, reasonably prudent ERISA 401(k) plan fiduciaries typically draw on multiple fund managers, because no single firm excels in every asset class, and that a lineup composed entirely of the sponsor's own funds departs from the "best-of-breed" approach. *Id.* ¶¶ 45–47. The 100% proprietary lineup model, claims Plaintiff, suggests that Defendants did not seriously consider alternative investment options. *Id.* ¶ 48. Plaintiff alleges that this arrangement benefitted FHI by generation fee revenue and adding investors participation and asset volume to its proprietary fund business. *Id.* ¶ 42. At times, Defendants added newly launched funds to the Plan lineup. For instance, for the 2014 Plan year, Defendants added the FHI Kaufman Large Cap Fund, and for 2016, the FHI MDT Large Cap Value IS Fund, both of which were new and had no proven track record. *Id.* ¶¶ 50–53. Defendants passed over established alternatives and treated

"participants in the Plan as captive investors to prop up Defendants' newly launched funds." *Id.* ¶ 53.

"As measured against comparable funds that Plan fiduciaries had themselves identified as appropriate benchmarks, the overwhelming majority of FHI Proprietary Funds offered through the Plan were chronic underperformers." *Id.* ¶ 56. Each of the seventeen FHI proprietary funds for which Plaintiff provides a comparison (in Table 2 of the Complaint) trailed its benchmarks over a five-year period by between 0.03% and 13.11%. *Id.* While several funds had large shortfalls, the two funds Plaintiff held, the Mid-Cap Index Fund and the Kaufmann Large Cap Fund, trailed their benchmarks by less than the average underperformance. *Id.*

In 2017, the FHI Notice of Investment Returns and Fee Comparison disclosed a recordkeeping expense of $79 per participant each year, while plans of comparable size paid between $37.67 and $49.06 per participant. *Id.* ¶¶ 61–62. Plaintiff alleges that "numerous other recordkeepers in the marketplace were capable of providing the same level of service at lesser costs." *Id.* ¶ 64. According to Plaintiff, overcharges amounted to at least half a million dollars in recordkeeping fees.[1]

As of the end of 2022, eleven FHI funds had both lower five-year returns and higher expense ratios than comparable non-FHI alternatives. *Id.* ¶ 59. For example, the BlackRock US Equity Markets Fund had a five-year return of 20.76% and had a 0.00% expense ratio, while FHI's comparable FHI Mid-Cap Index Fund had a 6.46% five-year return with an expense ratio of 0.32%. *Id.* At least twelve FHI funds trailed a market index or non-FHI fund in their category over five years. *Id.* ¶ 82.

[1] By the Court's calculation of the figures provided in Table 5, the overcharges added up to around $313,000 between 2017 and 2021. It is only before factoring the "Reasonable Per Participant Fee" that the recordkeeping fees amount to $500,000 or more. ECF No. 1 ¶ 63.

The poor performance and high cost of the FHI funds drove outside investors away, leaving the Plan's participants as captive base investors. *Id.* ¶¶ 65–67. The FHI funds performed so poorly as compared to the alternatives that only three of the FHI Capital Income Fund's managers held their own assets in the fund, and yet, as attrition grew, the fund remained as part of the Plan. *Id.* ¶¶ 71–72.

Plaintiff brings claims to recover losses incurred from Defendants' violations of fiduciary duties under ERISA pursuant to 29 U.S.C. §§1104–1106, 1109, individually and on behalf of the following Class: "All participants who invested in the Plan from August 28, 2017 to the present. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families." ECF No. 1 ¶ 94. On November 30, 2023, Defendants filed a Motion to Dismiss, along with a Brief in Support (ECF No. 22). On January 5, 2024, Plaintiff filed a Response Brief in opposition to the Motion (ECF No. 26). On February 2, 2024, Defendant filed a Reply Brief (ECF No. 27). Parties have also provided the Court with the benefit of several Notices of supplemental authority respecting the Court's disposition of the Motion (ECF Nos. 28, 29, 30, 33, 37, 38, 39, 50, 51, 53, 57, 59) and Responses to those Notices (ECF Nos. 31, 32, 34, 42, 49, 52, 54, 58, 60).

## II. Legal Standard

### A. Failure to State a Claim

Defendants move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits, but simply accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d

383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 554). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." (citation and editorial marks omitted)). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal,* 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g.*, *Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)).

## III. Discussion

### A. Rule 12(b)(1) Standing to Challenge Funds Not Held by Plaintiff

In addition to the Rule 12(b)(6) motion, Defendants move under Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff's claims, arguing that because Plaintiff has no viable claim as to the two funds he held, he lacks stake in the outcome of this lawsuit. Plaintiff responds that he advances claims respecting recordkeeping fees, in which he has a personal interest, and the claims broadly rely on a single flawed selection and monitoring process common to all of the Plan's funds, including the ones he held.

Defendants advance a factual challenge, supported by Plaintiff's account statements, which show that he held the FHI Mid-Cap Index Fund and the FHI Kaufmann Large Cap Fund. In a factual challenge, a court may weigh evidence outside the pleadings, but "must take care not to reach the merits of a case." *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) (quoting *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008)). The Third Circuit Court of Appeals has found that "when a factual challenge to jurisdiction attacks facts at the core of the merits of the underlying cause of action, 'the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case.'" *Id.* (quoting *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 898 n. 5 (3d Cir. 1987)). In other words, if a defendant's factual challenge turns on facts that would decide the merits of the causes of action, a court should not treat these factual challenges as a jurisdictional question, but rather as an argument as to the merits of the claims.

Defendants' standing argument relies on the assumption that the Court will rule that Plaintiff fails to state a claim as to the two funds he held. "Because Plaintiff has no viable claim concerning the only two funds he held in the Plan, he has no personal interest in this lawsuit." ECF No. 22 at 18. That argument places the cart before the proverbial horse. Courts in this Circuit "separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim" and "assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims." *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 162 (3d Cir. 2017) (citing *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003)). Whether Plaintiff has stated a claim as to the funds he held is therefore a question to be addressed under Rule 12(b)(6), which the Court will take up *infra*.

As Defendants point out, there is "no ERISA exception to Article III." *Thole v. U.S. Bank N.A*, 590 U.S. 538, 547 (2020). Accordingly, ERISA's rule allowing a plaintiff to sue on behalf of a plan still requires standing as to the named plaintiff. *Thole* involved a defined-benefit plan, in which the plaintiffs' benefits were fixed regardless of how the investments performed. *Id.* at 540. The Supreme Court explicitly contrasted this with a defined-contribution plan, as Plaintiff in this case held, in which participants benefit based on the value of their own accounts. *Id.* The key distinction for jurisdictional purposes is that in a defined-contribution plan, imprudent investments and excessive fees can reduce its value directly. *See Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132–33 (3d Cir. 2022) ("[P]articipants in a defined contribution ERISA plan have standing. . . . True, *Thole* held that, in the absence of a personal loss to a plaintiff's account, an abstract breach of fiduciary duty or a diminishment in a plan's assets is insufficient to confer standing. But the [plaintiffs] here have alleged the kind of concrete, personalized injuries traceable to the challenged conduct by defendants that *Thole* requires." (citing *Thole,* 590 U.S. 538, 541–44 (2020)).

Plaintiff's allegations are of the kind found in *Boley*, not *Thole*. The funds he held are among those alleged to have trailed the benchmarks chosen by the Plan's fiduciaries, and one of them charged higher fees than a named alternative. Additionally, positive returns on the Kauffman Large Cap Fund do not defeat standing, as Plaintiff's alleged injury is based upon what his account earned and what it would have earned under a prudent process and fees he should not have paid. Whether Plaintiff can prove such losses is a merits question. See *Davis*, 824 F.3d at 349 ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which [the plaintiff] could actually recover." (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946))).

Defendants' remaining argument is that Defendant held just two of the challenged funds in the Plan, and therefore lacks standing to challenge the rest of them. The Third Circuit Court rejected this argument in *Boley*, holding that "Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly imprudent due to the same decisions or courses of conduct" and "participants in a defined contribution ERISA plan have standing to bring claims alleging the fiduciary's 'process of selecting and managing options must have been flawed' even though the class representatives did not invest in every fund." *Boley*, 36 F.4th 124 at 132 (quoting *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019)). Once a participant shows injury to his own account from the challenged conduct, he may seek relief on behalf of the plan as a whole pursuant to ERISA § 502(a)(2), which authorizes suit on the plan's behalf.

Plaintiff's claims fall within the ambit of *Boley* because they speak to a single course of conduct respecting the Plan, rather than a series of decisions respecting individual funds. The funds held by Plaintiff are alleged to have been affected by this course of conduct. Defendants' authorities, gathered in footnotes 29 and 30, do not call for a different result, as none of the cited cases are within this Circuit, and therefore cannot trump *Boley*. Further, the cases cited in footnote 30 involve claims from plaintiffs who held none of the challenged funds.

Accordingly, the Court finds that Plaintiff has alleged an injury to his own Plan account that is traceable to the conduct challenged, and that he may pursue claims respecting the Plan's other investment options alleged to have resulted from the same course of conduct. Therefore, the Rule 12(b)(1) motion will be denied.[2]

[2] The Account Statement Defendants provide shows that Plaintiff withdrew his account in June 2020. Defendants mention that a plaintiff must keep a personal stake throughout the litigation and must have standing for each form of relief he seeks. While Defendants do not brief the questions robustly, it raises concerns in the Court's mind as to

**B. Count I – ERISA Duty of Prudence**

Defendants move to dismiss two Duty of Prudence claims in Count I. One is the duty of prudence in selecting and monitoring investments and the other is the duty of prudence in charging recordkeeping fees. Under the Employee Retirement Income Security Act of 1974 ("ERISA"), a fiduciary must "discharge [their] duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Perrone v. Johnson & Johnson*, 48 F.4th 166, 172 (3d Cir. 2022) (quoting 29 U.S.C. § 1104(a)(1)(B)). The requirement covers the duty of prudence at the initial selection of investments and "a continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes v. Nw. Univ.*, 595 U.S. 170, 175 (2022) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). The inquiry "will necessarily be context specific," and a court "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* at 177 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

The Third Circuit Court has found that "applying the duty of prudence is 'largely a process-based inquiry'" and "a court assesses a fiduciary's performance by looking at process rather than results." *In re Quest Diagnostics ERISA Litig.*, 179 F.4th 217, 226 (3d Cir. 2026) (quoting *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022)); *Sweda*, 923 F.3d at 329. Because the details of a fiduciary's process tend to be in their own hands until discovery, a plaintiff may proceed on a duty of prudence claim on circumstantial allegations. See *Sweda*, 923 F.3d 320 at

whether Plaintiff's withdrawal defeats his standing to seek, for instance, injunctive relief, or whether it limits the time period for which he may seek relief on behalf of others. Standing for purposes of the present Motion is measured by the injury suffered, and so this is a non-dispositive question today. The Complaint alleges that from 2017 to 2020, Plaintiff held funds that did not meet their benchmarks and paid recordkeeping fees. These facts are not erased by the 2020 cash-out, and Plaintiff may seek retrospective relief. But the Parties should be prepared to brief the issue of prospective relief at or before class certification.

332 ("While [the plaintiff] may not have directly alleged how [the defendant] mismanaged the Plan, she provided substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred. Based on her allegations, the [fiduciary breach claims] should not have been dismissed."). To "reasonably infer" a breach of the duty of prudence, courts must apply a "holistic approach" that considers all of the well-pled facts together. *Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 190 (3d Cir. 2024) (quoting *Sweda*, 923 F.3d 320 at 331). The complaint "should not be 'parsed piece by piece to determine whether each allegation, in isolation, is plausible'" and need not "rule out every possible lawful explanation for the conduct [the plaintiff] challenges." *Sweda*, 923 F.3d 320 at 331, 326 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594, 597 (8th Cir. 2009)).

**1. Duty of Prudence in Selecting and Monitoring Investments**

Defendants move to dismiss the Duty of Prudence claim as to investment selection and monitoring, arguing that Plaintiff did not allege facts showing imprudence as to the specific funds held by Plaintiff, as the Complaint does not show that these funds underperformed while Plaintiff held them, the comparators provided by Plaintiff are not meaningful benchmarks, and the five-year snapshot in the Complaint are isolated and modest shortfalls. Plaintiff responds that Defendants improperly parse the Complaint fund by fund, that a flawed process is adequately pled, that the Third Circuit Court of Appeals has not adopted a "flawed benchmark" requirement, and that the aptness of comparators is a question of fact, not law.

Defendants' argument focuses on the Complaint's allegations as to the two funds Plaintiff held. However, the Complaint does not allege two isolated imprudent choices or a range of imprudent activities as to just two funds. Instead, what is alleged is that Defendants used a flawed process to build and monitor a broad lineup of funds available in the Plan, which Plaintiff invested

in. Taking Defendants' proposed approach to this claim would amount to piece-by-piece parsing, in *Sweda* parlance. Instead, the Court will take a holistic approach to determine whether the Complaint alleges facts from which a flawed process can be inferred.

The Complaint alleges that every option available in the plan was an FHI fund, and no unaffiliated funds were on offer for the participants. A sponsor offering its own funds is not *per se* in breach, and ERISA's exemption scheme contemplates that investment companies may offer in-house funds in their plans. Prohibited Transaction Exemption 77-3 ("PTE 77-3"), 42 Fed. Reg. 18,734, 18,735 (Apr. 8, 1977). However, a lineup made up of only the sponsor's products for several years is relevant context in determining whether it is plausible, for pleading purposes, that the funds were selected and retained with ulterior motives rather than on their own merits.

The Complaint also alleges that outside investors had withdrawn from Defendants' funds, which suggests a reason why Defendants may have kept the funds as part of the Plan. For example, between 2016 and 2021, the FHI Capital Preservation Fund Y saw attrition of approximately 600 investors and over $1 billion in assets, and yet the Plan's assets continually increased. Defendants also allegedly added newly launched funds to the Plan, despite the lack of track record and potentially high risk. Together, these allegations are the sorts of "substantial circumstantial evidence from which the District Court could reasonably infer that a breach had occurred." *Sweda*, 923 F.3d 320 at 332. And indeed, these facts are consistent with the suggestion that Defendants were acting based more on their own financial interests than their fiduciary duty. The *Sweda* court found the duty of prudence claim plausible on similar allegations, claiming that the defendant had "unreasonable investment fees, include[ed] and retain[ed] high-cost investment options with historically poor performance compared to available alternatives, and retain[ed] multiple options in the same asset class and investment style." *Id.* at 331. The plaintiff alleged further that "60%

of Plan options underperformed appropriate benchmarks, and that [the defendant] failed to remove underperformers." *Id.* And unlike in this case, the plaintiff in *Sweda* did not advance a credible argument as to ulterior motive, at least based on what is available in the Third Circuit Court's opinion.

Defendants also advance a "meaningful benchmark" argument, positing that if Plaintiff relies on circumstantial evidence, he must provide meaningful benchmarks to show that a prudent fiduciary would have acted differently than Defendant. Citing several cases outside this Circuit, Defendants argue that alleging facts establishing that the comparators are meaningful benchmarks is an element of an ERISA duty of prudence claim, and so asserting that the benchmarks are meaningful, without more, is not a well-pled fact. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023); *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274 (8th Cir. 2022).

The Court is unmoved by this argument for two reasons. First, the Complaint alleges that the benchmarks are "funds that Plan fiduciaries had themselves identified as appropriate benchmarks." ECF No. 1 ¶ 56. Accepted as true, this allegation answers much of Defendants' argument. If Defendants themselves identified these benchmarks to measure the funds, it is potentially reasonable to infer on that alone that repeated shortfalls against these benchmarks should have prompted changes to the Plan.

Second, while the opinions Defendants cite have persuasive weight, they are not binding authority. The Third Circuit Court of Appeals has not adopted a meaningful benchmark pleading requirement. And although it may be true, as Defendants claim, that no circuit to consider the issue has rejected a meaningful benchmark requirement, this Court is bound by the current

guidance from the Third Circuit.[3] It may well be the case that if the Third Circuit faced this question it would establish a meaningful benchmark requirement, but until then, requiring such a pleading would be too close to violating the current law under *Mator*, which specifically cautions that imperfect comparisons are sufficient to state a claim for breach of fiduciary duty.[4] *Mator*, 102 F.4th at 188.

The Court does agree with Defendants that some of Plaintiff's comparisons are weak, even for the pleading stage. Table 3 pairs the FHI Mid-Cap Index Fund, which tracks the S&P MidCap 400, with the BlackRock US Equity Markets Fund, which tracks the Dow Jones U.S. Total Stock Market Index. *See* ECF No. 1 ¶ 59. Table 2 measures a bear-market fund against a three-month deposit rate, and a global allocation fund against a U.S. total market index. *See id.* ¶ 56. And many of the comparators are indices rather than investment funds. *See id.* But the Court has not relied on the weakest of these comparisons, and instead reaches its conclusion based on the allegations of broad shortfalls against the fiduciaries' own benchmarks in both 2019 and 2022.

The Court is also not persuaded that the alleged shortfalls are not sufficiently substantial. Defendants cite cases to establish that shortfalls of approximately 1% to 3.7% are not low enough to establish imprudent oversight. And indeed, the shortfalls alleged as to the two funds Plaintiff held do fall within that range. But the Complaint does not rest on those two funds alone, and some underperformed the benchmarks by quite a bit more than 3.7%.

---

[3] The Court notes that the United States Supreme Court has granted the petition for writ of certiorari in *Anderson v. Intel Corporation Investment Policy Committee*, a case from the Ninth Circuit Court of Appeals that covers whether a plaintiff must allege a meaningful benchmark in order to plead that a fiduciary breached the duty of prudence by offering underperforming investments. *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015 (9th Cir. 2025), *cert. granted*, 223 L. Ed. 2d 553 (Jan. 16, 2026). The case is set for oral argument on October 6, 2026. The Parties may notify the Court if the Supreme Court's decision bears on this ruling, and, if warranted, the Court will entertain new briefing on the matter.

[4] The Court also notes, incidentally, that much of the Third Circuit's recent decisions, including *In re Quest*, 179 F.4th 217 and *Cho v. Prudential Ins. Co. of Am.*, No. 25-1134, 2026 WL 74499 (3d Cir. Jan. 9, 2026), related to summary judgment, and so the courts had the opportunity to examine developed records, something Plaintiff here lacks the luxury of offering before discovery.

Finally, the Court turns to the outside facts that Defendants asks the Court to consider and that ostensibly contradict the facts in the Complaint. Specifically, Defendants ask the Court to consider Morningstar category rankings, prospectus performance data, a share class inception date, and a 2012 Form 5500. As noted *supra*, on a motion to dismiss, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). When it comes to publicly available information not alleged, raised, or relied on in the complaint, "the Court must be cautious not to take notice of the truth of any matters that can be reasonably contested." *Vrakas v. United States Steel Corp.*, No. CV 17-579, 2018 WL 4680314, at *5 (W.D. Pa. Sept. 29, 2018) (citing *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002)). This caution has been analogized to the hearsay rule, which allows the admission of out of court statements if they are not provided as evidence for the truth of the matter asserted. *See, e.g., S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999). While Defendants claim that courts "routinely consider prospectuses in resolving a motion to dismiss," they provide no binding authority, and so the cases cited in this paragraph control. ECF No. 22 at n.15. Based on that precedent, the Court cannot resolve factual disputes between the parties on the evidence of public information that allegedly contradicts the Complaint.

Accordingly, as to the Duty of Prudence in selecting and monitoring investments claim, Plaintiff has alleged sufficient facts to state a claim for relief, and so, as to this claim, the Court will deny the Motion to Dismiss.

**2. Duty of Prudence as to Recordkeeping Fees**

Defendants move to dismiss the recordkeeping fees theory in Count I, arguing that it (1) rests on a bare price comparison to four plans, without alleging facts contrasting the services of those plans to the Plan, (2) ignores the comparators' Forms 5500, which show that Plaintiff's figures omit indirect compensation, and (3) fails to mention that one comparators' recordkeeper serves a much larger combined trust. Plaintiff responds that his comparison to four similarly sized plans, together with his allegations that recordkeeping services are fungible and the market for them is competitive, suffice at the pleading stage, and that Defendants' attacks on his comparators raise factual disputes to be addressed at a later stage.

In *Johnson v. PNC*, a court in this District denied a motion to dismiss on similar allegations and where the defendants argued that plaintiff relied on "cherry-picked 401(k) benchmark comparison." *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-CV-01493-CCW, 2022 WL 973581, at *5 (W.D. Pa. Mar. 31, 2022). Nevertheless, Judge Wiegand found that, because "[p]laintiffs allege that the Plan's average per participant, per year recordkeeping fee of $52.58 is 'unreasonable and excessive relative to the services received[,]' especially when compared to the four other 401(k) plans noted within the Plaintiffs' benchmark table," this was "sufficient to raise an inference that [the defendants] 'failed to follow a prudent process to ensure that the Plan was paying only reasonable fees.'" *Id.* at *6 (docket citation omitted).

Since the present Motion was briefed, the Third Circuit Court has twice addressed this type of claim, and reversed dismissal in both cases. In *Mator*, the plaintiffs alleged that their plan paid $154 per participant in recordkeeping fees, while five similarly sized plans paid $37 to $52, for an average of $44 per plan. *Mator*, 102 F.4th at 180. The court found that the plaintiffs provided "specific plan comparators, not just industry averages, and plausibly allege that the services

purchased were sufficiently similar to render the comparisons valid" and ultimately that the plaintiffs' comparisons of the fee structures between the plans, "while not perfect, [were] sufficient to plausibly state a claim for breach of fiduciary duty." *Id.* at 188.

In *Kruchten v. Ricoh*, the Third Circuit Court reversed the lower court's dismissal of the claims alleging a twofold gap between the fees charged and the industry average, explaining that *Sweda* and *Mator* "provide guidance on evaluating the factual context around excessive fees rather than prescribing a particular level where fees are acceptable." *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *4 (3d Cir. July 24, 2024). Despite the fact that the defendants had emphasized "potential flaws in the fee comparison calculations made by" the plaintiffs, the *Kruchten* court concluded that "'even taking [calculation] problems into account, . . . the comparators are sufficiently similar to the Plan, to state a claim.'" *Id.* (quoting *Mator*, 102 F.4th at 190).

Measured against those decisions, the facts alleged here also state a claim. Plaintiff identifies four specific plans (not an industry average), with $550 million to $613 million in assets and 1,716 to 2,477 participants, which closely match the Plan size. The Plan's cost of $79 to $90 per participant is roughly 1.6 to 2.4 times what the comparator plans paid in fees. It is true that the Complaint says little about the services the Plan receives in exchange for the fees, relying on general allegations that other plans' fees reflect similar features and services, but neither *Mator* nor *Kuchten* demanded, prior to discovery, that the plaintiffs list the services the plans purchased. And both explicitly accepted as well-pled the allegations that recordkeeping services were competitive and therefore likely similar. *Kruchten*, 2024 WL 3518308, at *3 ("Contrary to [the defendants'] claims, the Complaint's allegations that the [recordkeeping] services market is commodified and competitive are not mere 'conclusions' that we must reject.); *Mator*, 102 F.4th

at 186 (assuming the truth of the allegation that "due to the nature and competitiveness of the market at the top levels [of] recordkeeping service for large plans, it would be reasonable to infer that similar services" were provided).

Ultimately, Defendants' specific criticisms of the sort of comparators provided in the Complaint raise factual questions that cannot be resolved on the pleadings. They point out that the comparators' Forms 5500 report indirect compensation, which Plaintiff does not allege here, and that the LLNS Savings Plan's recordkeeper served a master trust with 10,275 participants and $2.4 billion in assets (some five times the size of the Plan). But *Mator* declined to resolve similar disputes, including one respecting Form 5500 entries, noting that "the record does not reveal the codes' precise meanings, nor whether all plans define the codes consistently. But given that all the plans received some portion of an overlapping constellation of recordkeeping services, the comparisons help nudge the [plaintiffs'] claims across the line from possible to plausible." *Mator*, 102 F.4th at 186. In the Court's judgment, that observation applies here equally. The comparators Plaintiff lists provide a plausible claim, and whether the comparisons ultimately hold up is a question for discovery.

Accordingly, as to the claim of Duty of Prudence in charging recordkeeping fees, Plaintiff has alleged sufficient facts to state a claim, and so, as to this claim, the Court will deny the Motion to Dismiss.

**C. Count I – ERISA Duty of Loyalty**

Defendants move to dismiss the Duty of Loyalty claim, arguing that it merely restates the prudence claim and adds only the "innocuous" fact that the Plan offered FHI's own funds. While Plaintiff does not reply directly, his Response does generally assert that the offerings and monitoring processes were tainted with disloyalty.

Under ERISA, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." *Sweda*, 923 F.3d 320 at 328 (quoting 29 U.S.C. § 1104(a)(1)(A)). A duty of loyalty claim therefore requires the plaintiff to allege facts showing that the fiduciary acted to benefit itself or a third party, not merely that there was a conflict of interest or that a decision incidentally benefited the fiduciary. The "potential for conflict, without more, is not synonymous with a plausible claim of fiduciary disloyalty." *Johnson*, 2022 WL 973581, at *7 (quoting *Kopp v. Klein*, 894 F.3d 214, 222 (5th Cir. 2018)). A plaintiff cannot "simply 'recast' a claim of imprudence as an independent claim of disloyalty without additional facts suggesting an improper motive or financial benefit." *Chrupcala on behalf of Firstrust 401(k) & Profit Sharing Plan v. Firstrust Sav. Bank*, 828 F. Supp. 3d 563 (E.D. Pa. 2026) (quoting *Cho v. Prudential Ins. Co. of Am.*, No. CV 19-19886 (JMV) (SCM), 2021 WL 4438186, at 11 (D.N.J. Sept. 27, 2021)).

As noted *supra*, the Court agrees with Defendants that offering a sponsor's own funds is not inherently disloyal, and PTE 77-3 allows investment firms to offer in-house funds in their menu of plans. However, this exemption to the prohibited transaction rules does not relieve fiduciaries of their broader duty of loyalty and prudence. The Department of Labor has said as much explicitly respecting PTE 77-3, stating, "if the decision is motivated by the intent to generate seed money that facilitates the marketing of the mutual fund, then the plan fiduciary would be liable for any loss resulting from such breach of fiduciary responsibility, even if the acquisition of mutual fund shares was exempt by reason of PTE 77-3." U.S. Dep't of Labor, Advisory Op. 1998-06A (July 30, 1998). Accordingly, the Court must determine whether the Complaint's allegation support more than the mere fact that the Plan's funds were owned by FHI or its affiliates.

The facts here go beyond the "potential for conflict" of interest that *Johnson* envisions. *Johnson*, 2022 WL 973581, at *7. Throughout the Relevant Period, FHI allegedly collected management fees on every designated option in the Plan and counted the Plan's investments toward its own assets under management. The Complaint also alleges that, despite poor performance, Defendants kept these funds in the Plan, even as outside investors and one fund's own managers withdrew, supporting the inference that the Plan participants served as a captive investor base for FHI's fund business. Plaintiff further alleges that the Plan's default investment, which receives the contributions of participants who make no elections, continued to draw Plan money while more than $1 billion left the fund. Plaintiff also details incidents where newly launched and unproven funds were added to the Plan. These allegations potentially speak directly to the Labor Department's point about using the exemptions of PTE 77-3 to generate seed money or provide volume for marketing purposes. At the very least they plausibly suggest that Defendants selected and retained FHI's funds to benefit FHI and not the participants.

As to Defendants' objection that the Duty of Loyalty cannot survive on its own without a Duty of Prudence claim, given that a Prudence claim survives, this objection is of no matter.

Accordingly, the Court finds that Plaintiff has properly stated a claim for breach of the Duty of Loyalty. The question of whether Defendants in fact acted with improper motive will be addressed on a more fully developed record. As such, as to the Duty of Loyalty claim, the Motion to Dismiss will be denied.

**D. Count II - Prohibited Transactions with a Party in Interest**

Defendant moves to dismiss the Prohibited Transaction claim, arguing that Plaintiff does not plausibly allege an intent to benefit a party in interest, and that offering a sponsor's own or affiliated funds is exempt under PTE 77-3. Plaintiff responds that the Complaint expressly alleges

that the selection of Plan investments was driven by FHI's commercial interests, which is enough to plead the required intent and shift the burden to Defendants to set forth a PTE 77-3 affirmative defense in their Answer to the Complaint.

Under ERISA § 1106, a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect," *inter alia*, "(C) furnishing of goods, services, or facilities between the plan and a party in interest" or "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C)–(D). The Complaint alleges that FHI, as the Plan's sponsor and a service provider for the Plan, is a party in interest, and Defendants do not dispute this allegation.

Respecting subsection (C), Defendants argue that under *Sweda*, "absent factual allegations that support an element of intent to benefit a party in interest, a plaintiff does not plausibly allege that a 'transaction that constitutes a direct or indirect . . . furnishing of goods, services, or facilities between the plan and a party in interest' prohibited by § 1106(a)(1)(C) has occurred." *Sweda*, 923 F.3d at 338 (quoting 29 U.S.C. § 1106(a)(1)(C)).

However, the United States Supreme Court has since articulated a different standard. "To state a claim under § 1106(a)(1)(C), a plaintiff need only plausibly allege the elements contained in that provision itself, without addressing potential § 1108 exemptions." *Cunningham v. Cornell Univ.*, 604 U.S. 693, 693 (2025). The exemptions are affirmative defenses, which are "not something the plaintiff must anticipate and negate in her pleading." *Id.* at 702 (quoting *Perry v. Merit Systems Prot. Bd.*, 582 U.S. 420, 435, n. 9 (2017)) (internal quotation marks omitted). While the Supreme Court's decision in *Cunningham* and the Third Circuit Court's decision in *Sweda* appear to be in tension, *Cunningham* ultimately controls. Accordingly, Plaintiff need not allege intent to state a claim under subsection (C), and so Defendants' objection fails.

To state a claim under subsection (D), a plaintiff must allege facts showing that "(1) the person or entity is a fiduciary with respect to the plan; (2) the fiduciary causes the plan to engage in the transaction at issue; (3) the transaction uses plan assets; (4) the transaction's use of the assets is for the benefit of a party in interest; and (5) the fiduciary knows or should know that elements three and four are satisfied." *Reich v. Compton*, 57 F.3d 270, 278 (3d Cir. 1995) (cleaned up). The Third Circuit Court has held that element four, or the "for the benefit of" clause, "requires proof of a subjective intent to benefit a party in interest." *Id.* Unlike *Sweda*, the *Reich* decision is not constrained by *Cunningham*.

As discussed *supra*, the Complaint alleges that FHI kept its own funds in the Plan even as outside investors fled and the funds' own managers withdrew, that the Plan's default fund kept drawing participant contributions while more than $1 billion left it, and that FHI seeded newly launched funds with tens of millions of Plan dollars. Those allegations suggest both Defendants' understanding of the harm to participants on the one hand and the benefit to FHI on the other. Thus, they plausibly support the inference that Defendants acted with the intent to benefit FHI and not the Plan.

As to the question of the PTE 77-3 defense, it seems clear that under *Cunningham* PTE 77-3 is an affirmative defense that Defendants must plead and prove rather than an element Plaintiff must negate in the pleadings. *Cunningham*, 604 U.S. at 694, 702 ("[T]he § 1108 exemptions are structured as affirmative defenses that must be pleaded and proved by defendants who seek to benefit from them. . . . Ordinarily, it is incumbent on the defendant to plead and prove an affirmative defense" and it "is not something the plaintiff must anticipate and negate in her pleading."). A claim may only be dismissed on the basis of an affirmative defense if the defense

is "apparent on the face of the complaint." *Schmidt v. Skolas*, 770 F.3d 241 (3d Cir. 2014) (quoting *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002)).

The PTE 77-3 defense is not apparent here from the face of the Complaint. "PTE 77-3 applies so long as a plan does not: (a) pay any fees to the investment adviser except via the investment company's payment of its standard advisory and other fees; (b) pay a redemption fee to any party other than the investment company itself; (c) pay a sales commission; and (d) have dealings with the investment company on terms that are less favorable than between the investment company and any other shareholder." *Mehling v. New York Life Ins. Co.*, 163 F. Supp. 2d 502, 510 (E.D. Pa. 2001). The Complaint alleges that the challenged transactions "were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders," allegations that speak directly to the conditions upon which the availability of PTE 77-3's exemption depends. ECF No. 1 ¶ 118.

Accordingly, the question of whether the PTE 77-3 exemption applies is left for a later stage in the litigation. For the reasons described in this section, as to the Prohibited Transaction claim in Count II, the Court will deny the Motion to Dismiss.

**E. Count III - Prohibited Transactions with Fiduciaries**

Defendants move to dismiss the Prohibited Transaction claim in Count III, arguing that it rests on the same conclusory allegation that FHI benefitted from offering its own funds and that Section 1106(b), which speaks to fiduciary self-dealing, targets kickbacks, not compensating fiduciaries for services they provide to the plan. Plaintiff does not directly respond to Defendants' argument.

Under Section 1106(b), a fiduciary may not "(1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction

involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106b(1)–(3).

Defendants argue that, pursuant to *Danza v. Fidelity*, "Section 406(b)'s purpose is to prohibit transactions that might involve self-dealing by a fiduciary, not to prevent fiduciaries from being paid for their work." *Danza v. Fid. Mgmt. Tr. Co.*, 533 F. App'x 120, 126 (3d Cir. 2013). While this distinction is a fair one, this case potentially falls on the self-dealing side of that line. The facts in *Danza* involved a fiduciary that collected fixed fees, negotiated the fees at arm's length before it was a fiduciary of the plan, and had no discretion or control over its own compensation. *Id.* The facts there could not reasonably give rise to an inference of self-dealing. *Rosen v. Prudential*, the other case Defendants rely on, is a decision from another circuit and does not bind this Court, but it involved revenue-sharing payments that a plan's service provider received from third-party mutual fund managers under an arrangement negotiated by the unaffiliated employer. *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3 (2d Cir. 2017). Here, on the other hand, the payments allegedly went from a plan's investments to the fiduciary (or its affiliates) under a structure the fiduciary selected.

As alleged in the Complaint, FHI, a fiduciary with discretionary authority over the Plan, used that authority to place Plan money in funds managed by itself or its subsidiaries, and then collected fees from those investments. Such an arrangement, if proven, is arguably classic self-dealing. "[A] fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which

such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service." 29 C.F.R. § 2550.408b-2(e)(1).

Accordingly, the Complaint adequately alleges a Prohibited Transaction claim, in that FHI took payments for its own benefit out of the Plan's investments in its own or its subsidiaries' funds. And so, as to Count III, the Court will deny the Motion to Dismiss.

**F. Count IV - Failure to Monitor Fiduciaries**

Defendants move to dismiss the Failure to Monitor claim, arguing that there is no underlying breach, that the claim consists only of legal conclusions, and that the claim engages in impermissible group-pleading by lumping all Defendants together without saying who delegated responsibility to whom. Plaintiff responds only that the Failure to Monitor claim survives because the underlying claims survive. Because the underlying claims survive the Motion, the Court will consider only Defendants' second and third grounds for dismissal.

"The power to appoint and dismiss an investment fiduciary carries with it a duty to monitor appropriately those subject to removal." *Perez v. WPN Corp.*, No. CV 14-1494, 2017 WL 2461452, at *12 (W.D. Pa. June 7, 2017) (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996)) (internal quotation marks omitted). Those "appointing fiduciaries 'are required to have procedures in place so that on an ongoing basis they may review and evaluate whether the investment fiduciaries are doing an adequate job.'" *Id.* (quoting *In re: Williams Co. ERISA Lit.*, No. 02-153 (N.D. Ola. Aug 22, 2003) (DOL Amicus Brief, attached as Ex. A to Def. Supp. Br., at 8–9)). The Complaint alleges no facts about which Defendant made appointments or about the lack of an oversight procedure. Instead, Plaintiff claims that "Defendants delegated some or all their fiduciary responsibilities to various other appointed individuals, entities, or parties" and "[t]o the extent that Defendants delegated any such fiduciary responsibilities to others, Defendants

are further liable for failing to appropriately monitor its delegees." ECF No. 1 ¶¶ 136–137. This does not identify any appointing fiduciary or any appointee, and it does not allege what sort of review process, if any, occurred or was neglected. Allegations at this level of vagueness and generality do not provide any Defendant with fair notice of the claim or claims leveled against it and do not permit the Court to draw the inference that a particular Defendant is liable for particular misconduct alleged. *See Iqbal*, 556 U.S. at 662, 678.

Accordingly, the Court finds that the Complaint fails to provide adequate allegations as to the appointment or delegation relationship on which the duty to monitor depends. As such, as to the Failure to Monitor claim, the Court will grant the Motion to Dismiss.

## IV. Conclusion

For the reasons discussed above, the Court will grant in part and deny in part Defendants' Motions to Dismiss. Count IV will be dismissed without prejudice, and the Court will grant Plaintiffs leave to amend their complaint within 21 days of the date of this Memorandum. An appropriate Order of Court follows.

BY THE COURT:

*/s/Robert J. Colville*________
Robert J. Colville
United States District Judge

DATED: September 23, 2026

cc: All counsel of record,